KONIECZKI, Respondent, v. GREAT AMERICAN INDEMNITY
COMPANY OF NEW YORK and another, Appellants.

*December 1, 1960—January 10, 1961.*

For the appellants there was a brief by *Schmidt & Thibodeau* of Wisconsin Rapids, and oral argument by *Leon S. Schmidt.*

For the respondent there was a brief and oral argument by *W. W. Crosby* of Stevens Point.

MARTIN, C. J.   On the date of the accident, November 13, 1957, respondent, a resident of Wisconsin Rapids, was employed at Biron division of Consolidated Water Power & Paper Company. He was fifty-eight years of age and had worked at said company for eighteen years. At the time in

question his shift was from 3 p. m. to 11 p. m., five days a week.

The defendant Calvi, doing business as Tri-City Bus Company, owned the bus involved in this case.

On the night of November 13, 1957, respondent was returning from work on a bus driven by Therry Case. When alighting from the rear door at the intersection of Third and Jackson streets in Wisconsin Rapids the door of the bus closed on respondent's arm; the remainder of his body was outside the door. In fear that the bus would drive off and that if he pulled out his arm he might fall under the bus, he twisted his body around and caught the flap of the door with his other hand. He remained in that awkward position for about a minute until the bus driver opened the door in response to a call by one Kenneth Fancher, a fellow passenger waiting to follow respondent from the bus, that, "You got a man caught in the door."

Case, the bus driver, testified that the operator of the bus controls the doors by a lever from the driver's seat; that when he stopped the bus at the intersection of Third and Jackson, he opened both front and back doors and probably eight or nine people got out, some from the front and some from the back. He testified that prior to closing the rear door he looked to the rear, both through the mirror and by turning his head, to see if anybody was waiting to get out, but he saw no one—

"*Q*. And you did not see, at the time you opened the door to release Mr. Konieczki, if it was him, and two men standing by the door and still waiting to get out of the bus? *A*. No, this person hollered, whoever he was, and then I snapped the door open when he hollered that his arm was caught. I quickly snapped it open, and I looked through the mirror there and I still didn't see nothing, and then this other gentleman who said that this man's arm was caught in the door, hollered, 'All clear. They are off.'

"*Q.* Where was this man that hollered to you to open the bus door? *A.* I don't know if he was sitting there or standing up waiting to get off.

"*Q.* You don't know whether he was standing up waiting to get off, or you don't know whether he was sitting down? *A.* That's right. No, he was still in the bus."

Edward Molepski testified he was on the bus waiting to get off at Third and Jackson; that respondent was standing at the rear door, Fancher behind him and himself behind Fancher, in the aisle about four feet from the door; that both he and Fancher intended to leave the bus at that stop; that he noticed the door close and saw respondent's arm caught in it, and he heard Fancher call out, "Hey, you got a man caught in the door here."

Molepski's testimony is undisputed. As observed by the trial court, the driver's testimony that he looked back and saw no one is negative evidence, and that "all the positive evidence unquestionably was to the effect that this bus driver closed the door before the passengers had gotten out that were getting out there, and that he caught the arm of one of the passengers in the bus."

In oral argument appellants maintained that it would be physically impossible for the accident to have happened in the manner in which respondent described it. However that may be, respondent's actions were the immediate, and apparently panicky, reaction to an unexpected occurrence, and it can hardly be expected that he would recall just what he did with any great degree of accuracy. It is undisputed that his arm was caught in the door, as the result of which he twisted his body into an awkward and painful position. On the basis of the uncontroverted evidence, the trial court properly changed the verdict to find the bus driver negligent.

"If there is no credible evidence to sustain a jury's finding or answer the trial judge may, and he should, change it. *Maltby v. Thiel* (1937), 224 Wis. 648, 272 N. W. 848. In

*LaMotte v. Retail Hardware Mut. Fire Ins. Co.* (1930), 203 Wis. 41, 233 N. W. 566, this court sustained the trial court for changing an answer in a special verdict where there was no evidence in the record to justify the jury's answer." *Wintersberger v. Pioneer Iron & Metal Co.* (1959), 6 Wis. (2d) 69, 73, 94 N. W. (2d) 136.

Appellants further contend that it was error for the trial court to answer the cause question because if the bus driver were negligent, there was evidence to support a jury finding that such negligence was not causal.

Respondent experienced immediate pain in his arm and lower back when he twisted his body to hang onto the bus. After the door was opened he met his son, who was waiting to drive him home, and he told the son he was hurt. Throughout that night he suffered great pain in his arms, shoulder, and lower back and in the morning he went to see Dr. Frank Iber.

Dr. Iber testified that his examination of the respondent on November 14th disclosed contusions and discoloration at the neck and shoulder, some swelling and tenderness in the shoulder, and tenderness over the right kidney and lumbar region. Re-examination on November 18th revealed sustained muscle spasm, and respondent complained of pain in the back and legs and was hospitalized from that date until December 6, 1957. As to X rays taken of the respondent's back during that period of hospitalization, Dr. Iber testified:

"The X ray shows some arthritis, a minor amount of arthritis, plus the muscle spasm, which shows that there is something wrong with the back. We find that the straightening is always associated when there is something wrong with the back, and it is pulling. . . .

"The Court: Do you have an opinion, to a reasonable degree of medical certainty as to the cause of the back difficulty you have described, doctor? . . . A. Oh, I would say the difficulty that I found was due to the accident, yes."

The X rays referred to showed no herniation of the intervertebral disc.

Respondent testified he had never had any trouble with his lower back prior to the accident; that he had taken chiropractic treatments earlier in 1957 for trouble in the upper back, but never lost any time from work on account of it. He was treated by Dr. Iber at regular intervals after his hospitalization and in May, 1958, was still having pain in his lower back and leg.

In June of 1958, respondent twisted his back at work while reaching and scraping a tank and experienced pain at the same spot in his back where he felt it at the time of the bus accident. He again consulted Dr. Iber who examined him and sent him to Dr. Henry M. Suckle at Madison. Dr. Suckle found a straightening of the lumbar region of the back, tenderness over the fourth and fifth lumbar, a curve in the spine outward to the left, and a marked restriction of back bending, all of which were abnormal findings. A spinal test called a myelogram was done at the time of taking X rays, which revealed evidence of arthritis and an indentation between the fourth and fifth lumbars indicating pressure on nerve roots. Dr. Suckle advised the respondent that sooner or later he would need operative removal of the pressure on the nerves.

Upon a second examination on August 9, 1959, Dr. Suckle made the same findings. He then operated on the respondent, finding that he had not only an osteoarthritic spur but a disc protrusion at the same level of the back. After the operation respondent's leg pain was relieved but he had back discomfort which has since improved. Dr. Suckle's final diagnosis was osteoarthritis of the spine and a protruding intervertebral disc, and his opinion, based on the complete history of the respondent, to a reasonable medical certainty, was:

"I believe that the accident that he had on November 13, 1957, was the first time that he had the disc protrusion, and I think that it also made the arthritis that he had there symptomatic. In other words, he began to have symptoms not only due to the disc, but also due to the arthritis low in the back. . . . I believe that it [the injury resulting from the bus accident] was the primary source of the pain and the symptoms that Mr. Konieczki exhibited when we saw him. In other words, this was the thing that started the cycle."

Dr. Suckle further testified that respondent has a 25 per cent permanent partial disability in his back, and in his opinion he could not do his regular work, which involved lifting and bending for sustained periods, from April, 1959, to March, 1960.

Dr. Suckle also testified that the type of arthritis which the respondent had carries with it a degeneration of the disc; that one can have a degenerative disc with arthritis and have no trouble all during life, but with such a condition even a misstep could fracture the disc.

It was Dr. Iber's opinion that the bus accident resulted in a disc injury which caused the pain and discomfort for which he treated the respondent. It was also his opinion that he has a 30 per cent residual disability in his back and that he had advised respondent not to go back to work between April of 1959, and March of 1960.

Dr. Robert D. Taylor testified he was consulted by the respondent in Marshfield in October of 1958, with regard to pain and limitation of motion in the left shoulder and hand. He found a wasting of the shoulder muscles, a condition which commonly results from one of three things—injury, heart attack, or stroke. Examination disclosed no evidence of heart damage or a stroke, and it was his opinion that the shoulder injury was caused by the accident of November, 1957, the interval of six to eight months being the usual time for such a shoulder condition to develop after injury.

Appellants rely heavily in their argument on the testimony of Dr. R. E. Burns who examined respondent on January 13, 1960. On the basis of the full history of the patient, he testified:

"*Q.* So that as far as your examination is concerned, what you found in the back, these arthritic spurs and the degeneration of the disc, this condition of which he complains could have been possible without any trauma of any kind? *A.* Yes, that is just the heritage of time.

"*Q.* Because of his age? *A.* Yes.

"*Q.* And is this opinion based on a reasonable medical certainty, doctor? *A.* Yes."

Dr. Burns' testimony did not contradict that of the other doctors. It was merely negative in character in that he believed it was "possible" to account for respondent's back condition by his age alone, without any trauma. Considering all the expert testimony of a positive nature, there was no substantial issue of fact involved in the question of proximate cause, and it was not error for the trial court to answer that question "Yes."

There remains the question of the award of damages. Respondent testified that his actual wage loss due to his injuries was $5,719.53. The jury awarded him $2,700 for wage loss and $2,000 for personal injuries.

The doctors agreed that respondent's type of osteoarthritis is degenerative and progressive in character, that it becomes more disabling and painful with age. There is Dr. Burns' testimony, previously stated:

"*Q.* So that as far as your examination is concerned, what you found in the back, these arthritic spurs and the degeneration of the disc, this condition of which he complains could have been possible without any trauma of any kind? *A.* Yes, that is just the heritage of time."

This was sufficient evidence on which the jury could base its finding on damages for loss of wages. While the allowance for pain and suffering is low, it does not, in our opinion, show prejudice on the part of the jury.

*By the Court.*—Judgment affirmed.